1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TONY ASBERRY,

11            Plaintiff,              No.  2:09-cv-01494 MCE KJN P

12      vs.

13   MATHEW CATE, et al.,            ORDER and

14            Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17            Plaintiff Tony Asberry is a state prisoner, in the custody of the California

18   Department of Corrections and Rehabilitation (CDCR), who is currently incarcerated at the R.J.

19   Donovan Correctional Facility.  Plaintiff proceeds in forma pauperis and without counsel in this

20   civil rights action filed pursuant to 42 U.S.C. § 1983.  This action proceeds on plaintiff's original

21   complaint, filed June 1, 2009.  (ECF No. 1 (Cmplt.).)  Pending is a motion for summary

22   judgment filed by the sole remaining defendant, California State Prison-Sacramento (CSP-SAC)

23   Correctional Sergeant Phelps.  (ECF No. 73.)   For the reasons that follow, the undersigned

24   recommends that defendants' motion for summary judgment be granted.

25   ////

26   ////

II.  Background

Plaintiff, who is African-American, was incarcerated at CSP-SAC during the period of time relevant to this case.  This action proceeds against defendant Phelps on plaintiff's claims that defendant violated plaintiff's Fourteenth Amendment rights to equal protection and due process when he allegedly manipulated plaintiff out of his cell for the purpose of moving two white inmates into plaintiff's cell.  Plaintiff's Eighth Amendment claims were previously dismissed due to plaintiff's failure to exhaust his administrative remedies on those claims.[1]  (ECF Nos. 52-3.)  Although the pending motion for summary judgment was filed by defendants Phelps and Hernandez, plaintiff thereafter stipulated to the voluntary dismissal of defendant Hernandez.  (See ECF Nos. 77-8; 80.)   Defendant moves for summary judgment on the ground that he is entitled to judgment as a matter of law or, alternatively, because he is entitled to qualified immunity.

In tandem with filing the instant motion, defendant timely informed plaintiff of the requirements for opposing a motion for summary judgment, pursuant to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), and Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).  (ECF No. 73-1.)  Plaintiff filed an opposition (ECF No. 76), and defendant filed a reply (ECF No. 79).

III.  Legal Standards for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

---

[1]  Pursuant to defendants' motion to dismiss plaintiff's Eighth Amendment claims, plaintiff conceded that he had not administratively exhausted the allegations of his complaint that challenged the physical condition of the interim cells in which plaintiff was confined, and his alleged treatment by staff while plaintiff was so confined.  (See ECF No. 52 at 3-5.)

In a separate, unrelated, civil rights action, plaintiff pursues Eighth Amendment claims against defendant Phelps and others, premised on injuries plaintiff allegedly sustained from another inmate whom Phelps ordered placed in plaintiff's cell on January 25, 2010.  See Asberry v. Cate et al., Case No. 2:11-cv-2462 KJM KJN P.

1  the movant shows that there is no genuine dispute as to any material fact and the movant is

2  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

3      Under summary judgment practice, the moving party always bears
       the initial responsibility of informing the district court of the basis

4      for its motion, and identifying those portions of "the pleadings,
       depositions, answers to interrogatories, and admissions on file,

5      together with the affidavits, if any," which it believes demonstrate
       the absence of a genuine issue of material fact.

6

7  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

8  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

9  only prove that there is an absence of evidence to support the non-moving party's case." Nursing

10 Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

11 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

12 Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

13 burden of production may rely on a showing that a party who does have the trial burden cannot

14 produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

15 should be entered, after adequate time for discovery and upon motion, against a party who fails to

16 make a showing sufficient to establish the existence of an element essential to that party's case,

17 and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

18 "[A] complete failure of proof concerning an essential element of the nonmoving party's case

19 necessarily renders all other facts immaterial."  Id. at 323.

20      Consequently, if the moving party meets its initial responsibility, the burden then

21 shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

22 See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

23 to establish the existence of such a factual dispute, the opposing party may not rely upon the

24 allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

25 form of affidavits, and/or admissible discovery material in support of its contention that such a

26 dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6  1436 (9th Cir. 1987).

7          In the endeavor to establish the existence of a factual dispute, the opposing party

8  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

9  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

10  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

11  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

12  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

13  committee's note on 1963 amendments).

14          In resolving a summary judgment motion, the court examines the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

24  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

26  ////

IV.  Undisputed Facts

        The following facts are undisputed by the parties or, following the court's review of the record, have been deemed undisputed for purposes of the pending motion.  (See ECF Nos. 73-2, 76-1 at 1-7.)

        1.  Plaintiff was transferred to CSP-SAC on December 4, 2007, where he remained during the relevant period of this action.  (Defs.' Ex. A, Documents from Pl.'s Central File, p. 2, Movement History.)   Plaintiff is a participant in the Correctional Clinical Case Management System (CCCMS), a mental health program for inmates who are in the general population or in administrative segregation.  Plaintiff testified at his deposition that he had never been placed in administrative segregation (ad seg) prior to the incidents in this action.  (Pltf. Depo. at 10:16-8.)  Plaintiff is not a gang member.  (Defs.' Ex. B, Phelps Decl. ¶¶ 12, 13; Defs.' Ex. D; Defs.' Ex. A, pp. 5-6, Plaintiff's CDCR Form 1882.)

        2.  It is routine that, upon transfer to CSP-SAC, an inmate is screened by a Screening Authority and appears before a Classification Committee.  (Phelps Decl. ¶ 5.)  The Classification Committee establishes the inmate's security level and housing needs.  (Id. ¶ 6.) These findings are documented in a CDCR Form 128(g).  (Id.)

        3.  If the Classification Committee determines that an inmate cannot be safely housed in a double cell, the Committee affixes an "S" (single cell) suffix to the inmate's custody designation.  (Id. ¶ 6, citing Cal. Code Regs. tit. 15 § 3377.1(c).)  If an inmate does not have an "S" suffix, he is expected to share occupancy of a cell.  (Phelps Decl. ¶ 8, CSP-SAC Operational Procedure 131, Attach. 1.)  These inmates are not entitled to single cell assignment, choice of housing location, or choice of cellmate.  (Phelps Decl. ¶ 8, CSP-SAC Operational Procedure 131, Attach. 1.)  Inmates who refuse an order to double cell are subject to disciplinary action.[2]  (Id.)

---

   [2]  CSP-SAC Operational Procedure No. 131 (Inmate Housing), dated March 2008, provides in pertinent part (see Attach.1 to Phelps Decl.):

        If the inmate refuses to double cell, staff shall:

1    4.  When Plaintiff transferred to CSP-SAC, the Classification Committee cleared

2    him for double cell housing, as reflected in his 128(g).  (Defs.' Ex. A, Pp. 3-4, CDCR 128(g).)

3    Plaintiff does not have an "S" suffix.  (Id.)  In April 2008, Plaintiff was assigned to B Facility,

4    Housing Unit 2.  (Defs.' Ex. C, Pl.'s Dep. Aug. 10, 2012, 12:7-8.)

5    5.  Defendant Phelps is a Correctional Sergeant who has worked for CDCR for 25

6    years.  (Phelps Decl. ¶1.)  During 2008, defendant worked on B Facility at CSP-SAC.  (Id. ¶ 2.)

7    B Facility is divided into eight Housing Units.  (Id.)

8    6. In April 2008, CSP-SAC administration changed the designation of B Facility

9    Housing Unit 3 from a general population unit to a secure housing unit (SHU).  (Phelps Decl. ¶

10   3.)  As a result, all general population inmates housed in Housing Unit 3 had to be moved into

11   other Housing Units, and all available bed space in the other Housing Units had to be utilized.

12   (Id. ¶¶ 3-4.)

13   7.  In determining compatibility of inmates for double cell housing assignments,

14   Correctional Sergeants rely on the classification factors established by the Screening Authority

15   and Institutional Classification Committee.  (Phelps Decl. ¶ 5.)  The Screening Authority reviews

16   each inmate's central file, including the Form 128(g) prepared by the Classification Committee,

17   and compiles the relevant information into a CDCR Form 1882, "Initial Housing Review."  (Id. ¶

18   7.)  The rules governing this procedure are contained in CSP-SAC Operational Procedure 131.

19   _____

20
      a.  Based on the inmate's action being a serious disruption of
21    facility operations and the inmate's act of disobedience created a
      potential for violence or mass disruptive conduct, the inmate will
22    be issued a CDCR 115, Rules Violation Report, with the specific
      act of, "Refusing a Direct Order," a Division F offense.
23
      b.  Upon adjudication of the CDCR 115, staff shall attempt to
24    double cell the inmate by physically escorting the inmate or
      prospective cellmate to the designated cell.  If the inmate refuses to
25    double cell or accept the prospective cellmate, the inmate shall be
      issued a CDCR 115 with the specific act of, "Willfully
26    Delaying/Obstructing a Peace Officer in Performance of Their
      Duties," a Division D offense. . . .

1  (Phelps Decl., Attach. 1, Operational Procedure 131.)  Information contained on the CDCR Form

2  1882 includes the inmate's name, CDC number, ethnicity, date of birth, age, weight, height,

3  birthplace, nationality, commitment offense, date of offense, sentence, classification score,

4  escape history, history of racial violence, enemy concerns, history of aggression and assault,

5  eligibility for racially integrated housing, eligibility for double cell housing, and information

6  concerning physical and mental health status.  (Phelps Decl. ¶ 7.)

7          8.  On April 22, 2008, plaintiff was housed alone in a two-person cell in Housing

8  Unit 2, because, on April 20, 2008, plaintiff's cellmate was sent to ad seg for getting into a fight.

9  (Defs.' Ex. C, 12:5-24.)

10          9.  On April 20 or 22, 2008, plaintiff and inmate Traylor (who was celled in

11  Housing Unit 3) agreed that Traylor should move into plaintiff's cell.  Traylor wanted to remain

12  in Facility B and avoid a transfer to another facility or prison.  (Pltf. Depo. at 15:12-16:10; 62:21-

13  63:19; Cmplt. ¶¶ 16-20.)  Traylor obtained a "cell move request" that both he and plaintiff

14  signed, and submitted to Correctional Officer Bauser, who approved it but stated that it would

15  need to be "legitimized" by custody staff.  (Pltf. Depo. at 18:6-20.)  Plaintiff testified that, when

16  he agreed with Traylor to be cellmates, he was aware of Traylor's gang background, including

17  that "he was a Crip from 40s," but was not concerned because he "understood that it was going to

18  be temporarily (sic)."  (Id. at 16:19-25; see also id. at 15:20-2 ("he approached me about being

19  able to move in with me temporarily until he could get another placement")).

20          10.  On April 22, 2008, plaintiff was called to the Program Office and informed

21  by Officer Bauser that defendant Phelps had cancelled the request that inmate Traylor move into

22  plaintiff's cell.  (Pltf. Depo. 18:23-19:4.)

23          11.  Shortly thereafter, defendant Phelps reportedly told plaintiff, "[Y]ou need to

24  find a cell to move in because I want that cell."  (Pltf. Depo. at 20:1-3; see also id. at 20:15-6

25  ("Phelps told me . . . to get off the that (sic) cell that you're in.  I have people moving in there.");

26  id. at 20:19-25.)  Plaintiff was permitted to review a display of inmate pictures and names, for the

purpose of finding a cell to move into.  (Id. at 22:3-23:1; Phelps Decl. ¶ 15.)  Plaintiff avers that

Phelps knew that the "cell board" showed no open cells in Unit 2, but plaintiff nevertheless

"went cell to cell to find a cell."  (Cmplt. ¶¶ 27-30.)  Plaintiff testified that he also went to

Housing Unit 3 to find a cellmate, but was turned away.  (Pltf. Depo. at 23:4-15.)

        12.  Defendant Phelps then suggested that plaintiff move in with inmate Moody in

Housing Unit 3, and suggested that plaintiff talk with Moody.  (Phelps Decl. ¶ 16; Pltf. Depo at

31:9-25.)  Plaintiff testified that he talked with Moody but found him "legitimately moody."

(Pltf. Depo. at 31:23-5.)  Plaintiff testified (id. at 64:22-65:7):

> Moody was waiting to be diagnosed by psych so he could be
> placed in single-cell status, because I was not the first problem --
> Moody was in that cell by himself for a reason. . . . It was not good
> for Moody to be in a cell with anybody until it was understood it
> was going to safe to do so.  Moody did not possess the ability to
> even look me in the face and just make normal interactions, make
> you feel comfortable about being around him just for that moment,
> let alone going in there and going to sleep.

Plaintiff also testified, "Moody was in that cell by himself for a long time for the same concerns

that I had.  He was just a person that people couldn't live with."  (Id. at 33:20-3.)

        13.  Plaintiff would not agree to share a cell with Moody.  (Phelps Decl. ¶¶ 16,

18.)

        14.  When an inmate in the general population refuses to accept housing with

another general population inmate, he is deemed a threat to the safe and efficient operation of the

institution, and will be sent to ad seg.  If there is no room available in ad seg, then the inmate

may be temporarily housed in a holding cell,[3] or other available secure setting.  (Phelps Decl. ¶

19.)

////

_____

[3]  "Holding cells" are wired-in cubicals, without plumbing or sleeping facilities.  They are intended for temporary placement of an inmate, for no more than four hours, until permanent housing becomes available.  If a space in ad seg is not available, it is not unusual to place an inmate in a holding cell pending an opening in ad seg.  (Phelps Decl. ¶ 19.)

15. In response to plaintiff's refusal to accept inmate Moody as a cellmate, plaintiff was placed in a holding cell for approximately two hours. Defendant Phelps does not state whether he ordered plaintiff's initial placement in a holding cell (Defs.' Ex. C, 29:11-13), but both parties appear to make this assumption. Plaintiff avers that he was stripped to his boxer shorts and required to stand, handcuffed and in the cold, throughout this period of time.

16. Thereafter, although not suicidal, plaintiff was transferred to a suicide cell in the ZZ unit of Facility B,[4] where he remained for ten to twelve hours. Plaintiff avers that he was forced to sleep on the floor, in his boxer shorts, without a mattress or covers, and without toilet paper.

17. Defendant states that he "does not recall" whether he placed plaintiff in the suicide cell. (Phelps Decl. ¶ 21). However, defendant explains that, if plaintiff had been waiting in the holding cell and no space opened up in ad seg, it would be reasonable to place plaintiff in one of the ZZ cells while he continued to wait for space in ad seg, so that plaintiff would have plumbing, a larger living area, and space to sleep. (Phelps Decl. ¶ 21.) Unlike a holding cell, the cells in ZZ unit are not restricted to a four-hour occupancy. (Id. ¶¶ 20-1.)

18. During the night of April 22, 2008, a Lieutenant moved plaintiff to an empty cell in Housing Unit 3, which had been emptied of other inmates, where plaintiff spent the rest of the night.

19. The next day, on April 23, 2008, defendant Phelps gave plaintiff a direct order to accept inmate Moody as a cellmate, but plaintiff again declined to do so. (Phelps Decl. ¶¶ 22, 23.)

20. Defendant Phelps charged plaintiff with a disciplinary violation, and filed a Rules Violation Report (RVR), based on plaintiff's alleged refusal to obey a direct order to accept double-cell assignment. (Id. ¶ 24.)

---

[4] "ZZ-unit suicide cells" have no furniture because an empty cell is deemed safer for a suicidal inmate. (Phelps Decl. ¶ 20.)

21.   Plaintiff avers that he was again placed in a holding cage, cuffed and in his boxer shorts, then moved to ad seg.  Pursuant to the completion of a Form CDCR 115 (RVR), plaintiff was charged with the following disciplinary violation (Defs.' Ex. A at p. 8):

> On 4-23-08, at approximately 0745 hours, I ordered inmate ASBERRY [] to comply with the Institutions Double Cell Policy by completing a cell move to a double celled (sic) or accept a cellmate.  ASBERRY refused my direct order so I placed inmate ASBERRY into a holding cell and informed him he would be placed in Administrative Segregation for refusing a direct order to accept a cellmate.  Animate (sic) ASBERRY stated, "I'm not going in with anybody and no one is coming in with me."

A Form 114-D was also issued, authorizing plaintiff's placement in ad seg.  The stated reasons were as follows (Defs. Ex. A at p. 7):

> You are being placed in Administrative Segregation (Ad-Seg) on Wednesday, April 23, 2008.  Specifically, 4-23-08 you refused to comply with the Institutions Double Cell policy by refusing a direct order from Correctional Sergeant S.M. Phelps to either accept a cellmate or complete a cell move.  For this reason, your continued presence in the B-Facility, General Population is considered to be a threat to the safety and security of the Institution.  You will be seen by the Institutional Classification Committee (ICC) for appropriate program and housing considerations.

22.   Plaintiff testified at his deposition that he agreed to his placement in ad seg. Faced with the choice of celing with inmate Moody or being placed in ad seg, plaintiff reportedly told defendant Phelps, "Well, I think it's better for me to go to ad seg.  At least I can sleep without worrying about what's going to happen to me."  (Pltf. Depo. at 32:8-11.)

23.   On June 4, 2008, plaintiff was found guilty of the charged disciplinary offense, assessed 30 days loss of credit (subject to restoration after three months), counseled and reprimanded.  (Defs.' Ex. A, pp. 7-11, RVR Log No. CSP-SAC B-08-04-077.)  Plaintiff alleges that he was "taken from the A-1-A privilege group and placed in the A-2-B privilege group." (Cmplt. ¶ 79.)

24.   Plaintiff states that he returned to B yard feeling threatened, unsafe and paranoid "due to the treatment of plaintiff by B-yard staff."  (Id. ¶ 73.)

1   25.  On April 24, 2008, plaintiff filed an administrative grievance challenging the

2 actions of defendant Phelps, which he administratively exhausted before filing this civil rights

3 action.  (Appeal Log No. SAC-S-08-01839.)  (<u>See</u> ECF No. 1 at 18-36.)

4 V.  <u>Discussion</u>

5  A.  <u>Equal Protection</u>

6   Plaintiff's equal protection claim is premised on his allegation that defendant

7 Phelps, motivated by racial preference or animus, manipulated the transfer of two white inmates,

8 celled together in Building 3, into plaintiff's cell in Building 2.  Plaintiff alleges that defendant

9 cancelled plaintiff's cellmate request (Traylor), offered plaintiff an unacceptable cellmate

10 (Moody), then moved plaintiff into punitive placements, with the singular goal of transferring the

11 two white inmates into plaintiff's cell.  Plaintiff asserts that any legitimate reasons now offered

12 by defendant in support of this challenged conduct are merely pretextual.  (Dkt. No. 76-1 at 13.)

13 However, as discussed below, plaintiff has submitted no evidence to support a reasonable

14 inference that defendant's challenged conduct was motivated by racial discrimination.

15   The "Equal Protection Clause of the Fourteenth Amendment commands that no

16 State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

17 essentially a direction that all persons similarly situated should be treated alike."  <u>City of</u>

18 <u>Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985).  State prison inmates retain a

19 right to equal protection of the laws guaranteed by the Fourteenth Amendment.  <u>Walker v.</u>

20 <u>Gomez</u>, 370 F.3d 969, 974 (9th Cir. 2004) (citing <u>Lee v. Washington</u>, 390 U.S. 333, 334 (1968)).

21   In the prison context, however, even fundamental rights such as the
    right to equal protection are judged by a standard of reasonableness
22    -- specifically, whether the actions of prison officials are
    "reasonably related to legitimate penological interests."  <u>Turner v.</u>
23    <u>Safley</u>, 482 U.S. 78, 89 (1987); <u>see also</u> <u>Jordan v. Gardner</u>, 986
    F.2d 1521, 1530 (9th Cir. 1993) (equal protection concerns fall
24    under <u>Turner</u>).

25 <u>Walker</u>, 370 F.3d at 974.

26 ////

Prisoners retain the protection of the Equal Protection Clause from invidious discrimination based on race.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  Racial segregation is unconstitutional within prisons unless reasonably required to maintain prison security and discipline.  Cruz v. Beto, 405 U.S. 319, 321 (1972) (per curiam).  To demonstrate a violation of the Equal Protection Clause, a prisoner must show that the defendant intentionally discriminated against him based on plaintiff's membership in a protected class (e.g. race), Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003), Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 592 (9th Cir. 2008).  "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status.  To avoid summary judgment, [a plaintiff] must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence" that the challenged conduct was motivated by discriminatory intent.  Serrano, 345 F.3d at 1082 (citation and internal quotation marks omitted).

The four-part balancing test required by Turner v. Safley, supra, 482 U.S. 78, for determining the constitutionality of prison regulations, applies to prisoner equal protection claims, with an emphasis on whether the alleged difference in official treatment was reasonably related to legitimate penological interests.  Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (citations and quotation marks omitted).  The Turner factors[5] are to be considered in light of the

---

[5]  As summarized by the Ninth Circuit, the four Turner factors are as follows:

(1)  Whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

(2)  Whether there are alternative means of exercising the right that remain open to prison inmates;

(3)  Whether accommodation of the asserted constitutional right

competing principles that exist in a prison setting, specifically, that although prisoners retain

some constitutional rights, the courts are ill equipped to address matters of prison administration.

Mauro v. Arpaio, 188 F.3d 1054, 1058 (9th Cir. 1999) (en banc), citing Turner, 482 U.S. at 84.

"To maintain the necessary balance between these two basic principles, [courts] must apply a

deferential standard of review to challenges regarding prison regulations and uphold the

regulation 'if it is reasonably related to legitimate penological interests.'"  Mauro, 188 F.3d at

1058, quoting Turner, 482 U.S. at 89.

           Plaintiff alleges that defendant Phelps intentionally discriminated against him

because he is African-American and, on that basis, treated him differently than similarly situated

individuals (identified by plaintiff as "Facility B general population inmates") when defendant

moved two white inmates into plaintiff's cell.  At his deposition, plaintiff summarized his

pertinent allegations as follows (Pltf. Depo. at 58:20-60:12):

> What I'm saying to you is that the sergeant [defendant Phelps]
> canceled the move that I had, because he wanted to move into [the]
> cell -- two people into the cell that I was in because he -- he didn't
> have nowhere else to put them, and he wanted them to stay on the
> yard.
>
> So he took the cell that I was in and put me on suicide watch,
> initially in the holding cell, then the suicide watch and then
> eventually into the same housing unit that had to be emptied out
> anyway.
>
> And as a result of him not having anywhere to place me, he
> eventually had to put me in ad seg, because [Housing Unit 3] C
> section was completely empty. . . . [¶]  So he really didn't have any
> place to put me, so what he did is he put me in a position that he
> knew that was undoable in the first place.  I couldn't stay -- he tried
> a number of places to keep me.  He tried to keep me in the holding

---

> will impact . . . guards and other inmates, and . . . the allocation of
> prison resources generally; and
>
> (4)  Whether there is an absence of ready alternatives versus the
> existence of obvious, easy alternatives.

Shakur, 514 F.3d at 884, citing Turner, 482 U.S. at 89-90 (additional citations and internal
quotation marks omitted).

> cell, that was not doable.  He tried to keep me on suicide watch.
> You can't keep me to serve my sentence on suicide watch. . . .
>
> [N]ow I'm going to put you in a condemned cell area that you can't
> stay in there either.  So here's what you're going to have to do.
> You're faced with going in here and going to sleep with a guy that
> could possibly do something seriously to you and hurt you, or you
> can go to ad seg.  These are your options. . . .
>
> [H]e canceled a perfectly legitimate cell move in order to put me in
> this position. . . . He took my cell because he wanted to move the
> two white dudes into that cell.

(See also id. at 19:13-25, 20:1-3, 14-6, 25; 47:3-25; 48:1-2.)

Viewing the alleged facts in the light most favorable to plaintiff, the court finds that each of defendant's stated reasons for his challenged conduct, recited below, reflect legitimate penological purposes, without reasonable inference of racial discrimination.  As defendant now asserts, his challenged housing decisions are supported by "appropriate, non-racial custodial factors."  (ECF No. 79 at 2.)

Plaintiff initially challenges defendant's stated reasons for cancelling plaintiff's cell move with inmate Traylor.  Defendant states that he cancelled this proposed move due primarily to concerns for plaintiff's safety.  Defendant explains that Traylor was not a participant in CCCMS, is validated as a member of the "Rolling 40's" Crips gang, and is a younger, fitter inmate than plaintiff, with a history of violence.  (Phelps Decl. ¶ 12; Defs.' Ex. D, Inmate Traylor's CDCR Form 1882; cf. Defs.' Ex. A, pp. 5-6, Plaintiff's CDCR Form 1882.)  Defendant states that his safety assessment was based primarily on Traylor's gang status, although age and history of aggression were also significant factors.  (Id. ¶ 26.)  Defendant also states that, based on his knowledge of inmate behavior and gang politics, he did not believe that Traylor was sincere about celling with plaintiff.  (Phelps Decl. ¶ 14.)  Plaintiff responds that defendant's stated safety concerns are pretextual because plaintiff was previously celled with other gang members, without incident.  Plaintiff states that these former cellmates were inmate Johnson, and inmate Garland, and that Garland is a distant cousin of plaintiff, as well as a Compton Crip gang

1  member.  (Pltf. Depo. at 12:10-21; see ECF No. 76 at 2 et seq.)  Moreover, states plaintiff, when

2  he asked defendant why he cancelled the cell move, defendant stated, "'because I could,'" and

3  "'because I want that cell for two other inmates.'"  (Cmplt. ¶¶ 33-5.)

4          With the court's assistance, and that of the Attorney General's office, plaintiff has

5  attempted to obtain supporting affidavits from inmates Johnson and Garland.  (See ECF Nos. 75,

6  80, 84 -95.)  Plaintiff states that the proposed affidavits would demonstrate that plaintiff had

7  previously and successfully celled with gang members, thus undermining defendant's avowed

8  safety concerns in cancelling plaintiff's proposed cell move with inmate Traylor.  To date,

9  plaintiff has not submitted an affidavit from either former cellmate.[6]  Nevertheless, even

10  assuming the truth of plaintiff's averments, plaintiff has failed to raise a material factual dispute.

11  Cell assignments reflect the type of prison administrative decisions that require deference by the

12  courts.  Turner, 482 U.S. at 84-9; Mauro, 188 F.3d at 1058.  Even if the court had sufficient

13  evidence to compare, on paper, the individual characteristics and relevant histories of inmates

14  Traylor, Johnson, Garland and plaintiff -- this is the type of comparison and decision-making for

15  which courts are ill equipped.  Mauro, 188 F.3d at 1058.

16          Moreover, the fact that both plaintiff and inmate Traylor are African-American

17  (Phelps Decl. ¶ 25), and that the two inmates who ultimately obtained plaintiff's cell are white,

18  does not raise a reasonable inference of racial discrimination.  There is no evidence to contradict

19  defendant's assessment that Traylor's particular gang status, history of aggression, age, physical

20  fitness, and apparent lack of credibility, made him an inappropriate cellmate for plaintiff.

21          Plaintiff further contends that defendant's alleged discrimination is demonstrated,

22  in part, by defendant's failure to offer plaintiff the opportunity to cell with one of the two white

23  inmates.  (Pltf. Depo at 34:4-16.)  Plaintiff avers that defendant "Phelps never attempted to

24

25          [6] Plaintiff has, however, filed a "motion" for court order directing CDCR to track down
26  Garland, now paroled, and authorizing plaintiff to use the prison telephone to pursue the same
   goal.  (See ECF No. 96.)  For the reasons set forth herein, plaintiff's motion will be denied.

comply with the CDCR policy CCR 15 section 3269.1[7] of not using race as [a] reason for not

celling inmates of a different race together before evicting plaintiff from his assigned cell in that

sergeant Phelps never attempted to move one of the white inmates into the cell with plaintiff."

(Cmplt. ¶ 31.)  Defendant initially responds that, "[a]t no point did inmate Asberry request or

offer to house with an inmate of a different racial background from his own."  (Phelps Decl. ¶

28.)  While the cited regulation does not precondition interracial celling on inmate request, it

does require that prison administration refrain from making race a "primary determining factor in

housing." 15 C.C.R. § 3269.1.  Notwithstanding defendant's cursory response, in light of the

several legitimate penological reasons supporting defendant's cancellation of plaintiff's proposed

cell move with inmate Traylor, there is no basis for concluding that race was a "primary

determining factor" in defendant's challenged decision.

      Plaintiff next alleges that defendant's stated reasons for suggesting, then ordering,

that plaintiff cell with inmate Moody were also pretextual, because defendant knew that plaintiff

would refuse, and defendant could then justify removing plaintiff from his cell.  Defendant

responds that he determined inmate Moody would be a compatible cell partner for plaintiff

---

[7]  15 Cal. Code Reg. § 3269.1 provides for racially integrated housing, as follows:

An inmate's race will not be used as a primary determining factor in housing an
institution's inmate population.  Inmate housing assignments shall be made on the
basis of available documentation and individual case factors to implement an
Integrated Housing Policy (IHP). Individual case factors include, but are not
limited to, such factors as:

      (1) History of racial violence.
      (2) Commitment offense/time to serve.
      (3) Classification score.
      (4) Custody level.
      (5) Education.
      (6) Disciplinary history.

The IHP is set forth in these regulations.  Housing assignments will be determined
in a manner that will ensure that the safety, security, treatment, and rehabilitative
needs of the inmate are considered, as well as the safety and security of the public,
staff and institutions. . . .

because Moody, like plaintiff, was not affiliated with any gang, had a minimal history of violence and lower classification score, was older, and was also a participant in CCCMS, with a mental health status compatible with plaintiff's.  (Phelps Decl. ¶ 17; Defs. Ex. E, Inmate Moody's CDCR Form 1882; cf. Defs.' Ex. A, pp. 5-6, Plaintiff's CDCR Form 1882.)  Plaintiff responds that defendant knew that inmate Moody was psychologically unstable and that celling with him would have presented a threat to plaintiff's safety.  Both plaintiff and inmate Moody are African-American.  (Phelps Decl. ¶ 25.)

Plaintiff's allegations, particularly when viewed within the context of defendant's stated reasons for concluding that plaintiff and Moody would be compatible cellmates, do not raise a reasonable inference of racial discrimination.  There is no evidence to contradict defendant's stated reliance on the legitimate penological concerns of safety, "mental health status, age, and lack of gang affiliation" (Phelps Decl. ¶ 27), in concluding that inmate Moody would be a compatible cellmate for plaintiff.  Plaintiff has presented no evidence to support his theory that defendant, for racially discriminatory reasons, told plaintiff to cell with inmate Moody, knowing that plaintiff would reject the placement, and thus precipitate disciplinary action against plaintiff that would result in his cell becoming available, so that defendant could move in the two white inmates.

Similarly, plaintiff's further allegations do not create a material factual dispute concerning defendant's alleged racism, viz., that defendant moved the white inmates into plaintiff's cell on April 22, 2008, prior to imposing the disciplinary charge against plaintiff.  As explained by plaintiff (Pltf. Depo. at 63:20-64:17):

> The white guys moved in before I was even moved to 3 block, that's why I was put in the holding cage and essentially moved to the suicide watch, then essentially had to be place[d] in the 3 block, because the cell move -- I was not going to [cell] 214.  He [defendant Phelps] was taking that cell regardless. . . . And because he didn't have nowhere to put me, he put me in a position of making me move with Moody.  Had that have been an original option, he would have done that on [April] 22nd as opposed to the 23rd.

1    In other words, plaintiff alleges that defendant's decision to cell plaintiff with inmate Moody was

2    an afterthought, to "cover defendant's tracks," after defendant preemptively moved the two white

3    inmates into plaintiff's cell.  Defendant concedes generally that his purpose in requiring plaintiff

4    to double cell was so that a free cell would open up in Housing Unit 2, and he could move two

5    inmates, who were already double celled in Housing Unit 3, into Housing Unit 2.  (Phelps Decl. ¶

6    29.)  However, defendant explains, without any contradiction in the record, that it made no

7    difference to him what race the two inmates from Housing Unit 3 were, as long as they were

8    compatible, and safely housed in a double-cell, and that he gave no preference to any racial group

9    in making his challenged housing determinations.  (Id.)

10               In summary, even if defendant's stated reasons for his challenged conduct are

11   intended to obscure his allegedly true intent and conduct in moving the two white inmates into

12   plaintiff's cell, plaintiff has presented no evidence to support a reasonable inference that

13   defendant was motivated by racial preference or animus.  As underscored by plaintiff's own

14   statements, it may be clear only that defendant sought to "'look out' for his favorite inmates"

15   (Dkt. No. 76-1 at 13), whom he did not want moved out of Facility B, in part because one of the

16   two worked as a clerk for defendant Phelps in the sally port area (Pltf. Depo. at 19:13-19).

17   Plaintiff has introduced no evidence to suggest that defendant may have been motivated by

18   anything more, e.g., there is no evidence of record indicating that defendant had a history of

19   racially discriminatory conduct or speech, or that plaintiff and defendant had prior interactions

20   reflecting defendant's alleged racial animus.

21               For these several reasons, the undersigned finds that plaintiff has failed to

22   demonstrate the existence of a material factual dispute whether defendant's challenged conduct

23   was motivated by racial discrimination.  Rather, the evidence demonstrates that defendant's

24   challenged conduct was supported by racially neutral and penologically legitimate reasons,

25   without any affirmative evidence of racial preference or animus.  Therefore, the undersigned

26   ////

1  finds that summary judgment should be granted for defendant on plaintiff's equal protection

2  claim.

3       B.  Due Process

4            Upon initial screening, the court found that the complaint may state a potentially

5  cognizable substantive due process claim, under the Fourteenth Amendment, based on plaintiff's

6  allegedly arbitrary and capricious placements.  (ECF No. 7 at 4.)

7            The protections of the Fourteenth Amendment are both procedural and

8  substantive:

> [T]he touchstone of due process is protection of the individual
> against arbitrary action of government, whether the fault lies in a
> denial of fundamental procedural fairness, or in the exercise of
> power without any reasonable justification in the service of a
> legitimate governmental objective. . . . [D]ue process protection in
> the substantive sense limits what the government may do in both
> its legislative, and its executive capacities . . . .[O]nly the most
> egregious official conduct can be said to be arbitrary in the
> constitutional sense. . . . [T]he Due Process Clause was intended to
> prevent government officials from abusing their power, or
> employing it as an instrument of oppression. . . . [T]he substantive
> component of the Due Process Clause is violated by executive
> action only when it can properly be characterized as arbitrary, or
> conscience shocking, in a constitutional sense.

17  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (citations and internal quotation and

18  punctuation marks omitted).

19            Upon review of the entire record, and for the reasons stated above, the court now

20  finds that none of plaintiff's challenged placements -- including his initial placement in a holding

21  cell, then in a suicide cell and a cell in Housing Unit 3; again in a holding cell, then in ad seg;

22  and his underlying transfer out of his existing cell in Housing Unit 2 to, apparently, a new cell in

23  Housing Unit 3 -- can be characterized as "egregious . . .  arbitrary, or conscience shocking, in a

24  constitutional sense," Lewis, 523 U.S. at 846.  Plaintiff's allegations of capriciousness are

25  defeated by the legitimate penological reasons asserted by defendant for each challenged

26  placement.  See Richardson v. City & Count of Honolulu, 124 F.3d 1150, 1162 (9th Cir. 1997)

1   (state action that neither utilizes suspect classifications nor implicates fundamental rights will

2   violate substantive due process rights only where it is shown that the action is not "rationally

3   related to a legitimate governmental purpose"); see also Jones v. Blanas, 393 F.3d 918, 935 (9th

4   Cir. 2004) (government can overcome substantive due process claim by demonstrating that the

5   challenged restrictions were justified by legitimate, nonpunitive interests); accord, Kitchen v.

6   Pierce, 2013 WL 2684875, *2 (9th Cir. 2013) (no substantive due process violation where

7   presumption of punishment was overcome by defendants' legitimate justifications).  Therefore,

8   the court discerns no relevant material factual dispute underlying plaintiff's substantive due

9   process claim.

10          Moreover, the evidence does not demonstrate any material factual dispute relative

11   to  plaintiff's procedural due process claims.  The "requirements of procedural due process apply

12   only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of

13   liberty and property."  Burnsworth v. Gunderson, 179 F.3d 771, 774 (9th Cir. 1999).  A prisoner

14   possesses a protected liberty interest "when a change occurs in confinement that imposes an

15   'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'"

16   Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir. 2000) (quoting Sandin v. Conner, 515 U.S. 472,

17   484 (1995)).  Absent such a showing, segregated placements within a prison do not implicate a

18   protected liberty interest.  Serrano v. Francis, 345 F.3d 1071, 1078 (9th Cir. 2003); Resnick, 213

19   F.3d at 447-49 (prisoner's retention in SHU for seventy days pending a disciplinary hearing did

20   not give rise to a liberty interest protected by the Due Process Clause); Richardson v. Runnels,

21   594 F.3d 666, 672-73 (9th Cir. 2010) (administrative segregation for two weeks in the SHU

22   pending a gang investigation did not constitute the deprivation of a protected liberty interest); see

23   also Demerson v. Woodford, 2009 WL 498199 (E.D. Cal. 2009) (three days in a strip cell did not

24   give rise to due process claim); Woodall v. State of California, 2009 WL 3112021 (E.D. Cal.

25   2009) (eight hours in a holding cell did not impose an atypical condition of confinement

26   triggering due process protections).

1    In the present case, plaintiff's subject placements were justified by CSP-SAC

2  policies and procedures that define an inmate's refusal to double cell as a "serious disruption of

3  facility operations," as well as an "act of disobedience," and warrant the inmate's immediate

4  segregation from other prisoners.  (See CSP-SAC Operational Procedure No. 131 (Inmate

5  Housing), March 2008 (Phelps Decl., Attach. 1).)  Hence, defendant was authorized to separate

6  plaintiff from the general population, commencing with plaintiff's initial refusal to cell with

7  inmate Moody, on April 22, 2008.  The pertinent policies and procedures authorized staff to

8  continue to keep plaintiff separate from other inmates, by moving him from the holding cell to

9  the suicide cell, to a cell in Housing Unit 3.  When, on April 23, 2008, plaintiff refused

10  defendant's direct order to cell with inmate Moody, defendant was authorized to charge plaintiff

11  pursuant to a CDCR 115 (RVR), and move plaintiff from a holding cell into ad seg pending

12  resolution of the RVR.  Plaintiff's express choice to go to ad seg instead of being celled with

13  inmate Moody also, as a practical matter, undermines plaintiff's due process claims.  (Pltf. Depo.

14  at 32:8-11.)

15    Additionally, plaintiff does not challenge the procedures underlying his

16  disciplinary charge and hearing.  A prisoner facing disciplinary charges is entitled to advance

17  written notice of the charges, a hearing, written findings and reasons for the disciplinary action

18  taken and, when there is no security risk, to call witnesses and present evidence in his defense.

19  Wolff v. McDonnell, 418 U.S. 539, 563-566 (1974).  As long as these requirements are met, due

20  process has been satisfied.  Walker v. Sumner, 14 F.3d 1415, 1420 (9th Cir.1994).  In the present

21  case, plaintiff was accorded all of these protections -- he received  advance written notice of the

22  charge against him, a hearing, was permitted to call his witness and present evidence in his

23  defense, and received written findings explaining the reasons for the disciplinary action taken.

24  Plaintiff does not contend otherwise.

25    Finally, plaintiff is precluded from asserting a due process claim premised on

26  defendant's alleged fabrication of the underlying disciplinary charge, because the finding

1   sustaining that charge has not been invalidated.  See Edwards v. Balisok, 520 U.S. 641, 648

2   (1997.)  Rather, for the reasons set forth above, "some evidence" supports the disciplinary

3   finding, further satisfying the requirements of due process.  See Superintendent v. Hill, 472 U.S.

4   445, 455-56 (1985) ("the requirements of due process are satisfied if some evidence supports the

5   decision by the prison disciplinary board"); see also Touissaint v. McCarthy, 926 F.2d 800,

6   802-03 (9th Cir. 1991); Bostic v. Carlson, 884 F.2d 1267, 1269-70 (9th Cir. 1989).

7          For these reasons, the undersigned finds that plaintiff has failed to demonstrate the

8   existence of a material factual dispute pertinent to his procedural due process challenges.  The

9   evidence demonstrates defendant's conduct comported with prison policies and procedures, and

10   that plaintiff was accorded all due process protections to which he was entitled.

11          Accordingly, the undersigned recommends that summary judgment be granted for

12   defendant on plaintiff's due process claims.

13          C.  Qualified Immunity

14          The court need not reach defendant's alternative contention that he is entitled to

15   qualified immunity.  Where the alleged facts, viewed in the light most favorable to plaintiff, do

16   not sustain a constitutional claim, the court need not further consider a defendant's qualified

17   immunity defense.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

18          D.  Pendant State Law Claim

19          The complaint also alleges a state law equal protection claim, pursuant to the

20   California Constitution, Article I, section 7.  (See Cmplt., ECF No. 1 at 12 (Tenth Cause of

21   Action).)  Having resolved the federal claims over which this court has original jurisdiction, the

22   undersigned recommends that the court decline to exercise supplemental jurisdiction over

23   plaintiff's remaining state law claim.  See 28 U.S.C. § 1367(c)(3) (district court may decline to

24   exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which

25   it has original jurisdiction).  Plaintiff may, if he so chooses, pursue this claim in state court

26   pursuant to the time limitations set forth in 28 U.S.C. § 1367(d).

VI.  <u>Conclusion</u>

        For the foregoing reasons, IT IS HEREBY ORDERED that:

        1.  Plaintiff's motion filed August 1, 2013 (ECF No. 96), is denied.

        Additionally, IT IS HEREBY RECOMMENDED that:

        1.  Defendant's motion for summary judgment (ECF No. 73), on plaintiff's federal equal protection and due process claims, be granted.

        2.  Plaintiff's state law equal protection claim should be dismissed without prejudice.

        3.  This action be closed.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within 14 days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 6, 2013

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

asbe1494.msj